UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF CONNECTICUT

```
-------------------------------------------------------x
                                            :
RUSSELL PAUL MARTEL                         :          3:13 CV 229 (JGM)
                                            :
V.                                          :
                                            :
CAROLYN W. COLVIN,                          :
ACTING COMMISSIONER OF                      :
SOCIAL SECURITY                             :
                                            :          DATE: MARCH 5, 2014
------------------------------------------------------- x
```

<u>RECOMMENDED RULING ON PLAINTIFF'S MOTION TO REVERSE THE DECISION OF THE COMMISSIONER, AND ON DEFENDANT'S MOTION TO AFFIRM THE DECISION OF THE COMMISSIONER</u>

This action, filed under § 205(g) of the Social Security Act, 42 U.S.C. §§ 405(g) and 1383(c)(3), as amended, seeks review of a final decision by the Commissioner of Social Security ["SSA"] denying plaintiff Disability Insurance Benefits ["DIB"] and Supplemental Security Income ["SSI"] benefits.

## I.  ADMINISTRATIVE PROCEEDINGS

On December 2, 2010, plaintiff Russell Paul Martel, applied for DIB and SSI benefits claiming that he has been disabled since July 1, 2007, due to knee and back impairments. (Certified Transcript of Administrative Proceedings, dated July 24, 2013 ["Tr."] 162-69, 198; <u>see also</u> Tr. 194-203).  Plaintiff's application was denied initially and upon reconsideration. (Tr. 104-17 ; <u>see</u> Tr. 62-101).  On June 23, 2011, plaintiff filed a request for a hearing before an Administrative Law Judge ["ALJ"](<u>see</u> Tr. 118-26), and on March 2, 2012, a hearing was held before ALJ Ronald J. Thomas, at which plaintiff testified. (Tr. 40-61; <u>see</u> Tr. 132-59). Plaintiff has been represented by counsel. (Tr. 102-03, 160-61).  On March 21, 2012, ALJ Thomas  issued his decision finding that plaintiff has not been under a disability from July 1, 2007 through the date of his decision.  (Tr. 20-35).  On April 20, 2012, plaintiff filed his

request for review of the hearing decision (Tr. 16-17), and on December 19, 2012, the Appeals Council denied plaintiff's request for review, thereby rendering the ALJ's decision the final decision of the Commissioner.  (Tr. 1-3).

On February 19, 2013, plaintiff filed his complaint in this pending action.  (Dkt. #1).[1] On August 15, 2013, defendant filed her answer  (Dkt. #12),[2] and on November 13, 2013, plaintiff filed his Motion to Reverse the Decision of the Commissioner, with brief and exhibits in support.  (Dkt. #17; see Dkts. ##14-15).[3]   On January 31, 2014, defendant filed her Motion to Affirm the Decision of the Commissioner and brief in support. (Dkt. #22; see Dkts. ##19-20).

For the reasons stated below, plaintiff's Motion to Reverse (Dkt. #17) is granted consistent with this Recommended Ruling, and defendant's Motion to Affirm the Decision of the Commissioner (Dkt. #22) is denied.

II. FACTUAL BACKGROUND

A. ACTIVITIES OF DAILY LIVING AND HEARING TESTIMONY

Plaintiff was born in 1963 and is fifty years old.  (Tr. 44, 194).  He  completed tenth or eleventh grade. (Tr. 45, 198).  Plaintiff is separated from his wife; he testified that he and his wife "were off and on . . . . We never really got along too well." (Tr. 44, 53).  Plaintiff has been homeless, and he occasionally lives with family members.  (Tr. 204, 234; see Tr. 44-45 (living with disabled sister), 47-48 (living with brothers, friends and sister, "more or

---

[1]Plaintiff also filed a Motion to Proceed in Forma Pauperis (Dkt. #2), which motion was granted six days later.  (Dkt. #6).

[2]Attached to defendant's answer is a certified copy of the administrative transcript, dated July 24, 2013.  There is some duplication in the administrative record.

[3]Attached to plaintiff's motion are copies of unpublished case law, and a copy of Range of Joint Motion Evaluation Chart.

less bouncing from place-to-place[.]")).  At his hearing, plaintiff testified that when he stopped working, he lived off of "what [he] had accumulated.  Then, of course, [his] wife took some with her."  (Tr. 47).

Plaintiff reported an inability to do any activity that relates to standing or walking, and he cannot stretch.  (Tr. 205, 209, 226 (difficulty standing and walking due to pain), 234).  There is "clicking" in his knees, his knees are constantly shaking, and they are swollen from the pain and discomfort. (Tr. 234). His impairments affect his ability to lift, squat, bend, reach, sit, kneel, climb stairs, complete tasks or concentrate.  (Tr. 209, 212). When he wakes up his arms, from his elbows down, are completely numb and he "drop[s] things a lot." (Tr. 56).  He finds that dressing, bathing, shaving, eating, and using the toilet are all painful activities.  (Tr. 205, 229, 236 (cannot put shoes on; changing pants is "incredibly painful because I can't bend my knees."); see Tr. 52 ("the walls come in handy[ ]" when showering; he has "needed help in the bathroom area[.]")).  Plaintiff testified that he has pain; his arms fall asleep; the pain in his knees is "excruciating[,]" and when he takes painkillers, "they don't agree with [him]." (Tr. 49). In plaintiff's words, he "went [twenty] years with a ripped up knee working and now the other knee is worse than that knee. [He] just can't - - [he] can't motivate anymore. [He's] tried, [he] just can't do it anymore." (Id.).  He uses a cane to ambulate.  (Tr. 50).  Plaintiff testified that he underwent surgery on his left elbow in 1995; he had surgery on his right knee twenty years ago after a football injury; and he has a plate in his left ankle where he now has arthritis.  (Tr. 50-51).

Plaintiff has a hard time "lifting [himself] up[,]" and he opined that he could "probably lift up to [ten] or [fifteen] pounds."  (Tr. 51).  Plaintiff testified that he could "probably [sit for] about ten minutes[]" before having to move around because of the pain in his back and

knees, and he could stand "for maybe ten minutes without any real pain." (Tr. 55).   Plaintiff could walk "about a half-a-block to a block" and then he would need to "sit down for a second[.]" (Tr. 55, 210).

Plaintiff's sister does his laundry and cooks.  (Tr. 52).   Plaintiff reported that he cannot cook because it requires him to stand "to[o] long[.]" (Tr. 206, 229). Plaintiff watches television but he is "not much with the computer[.]" (Tr. 52).

Plaintiff takes or has taken Tramodol (Tr. 206, 213, 241), Voltaren (Tr. 241), Naprosyn (Tr. 206, 213), Motrin (Tr. 228, 241), Tylenol #3 (id.), Ibuprofen (Tr. 243), Oxycodone (Tr. 228, 243), Nexium (Tr. 206, 213, 228, 244), Lidoderm patches (Tr. 57, 206, 213, 228, 241, 243),  Percocet (Tr. 241), and Hydrocodone (Tr. 244).  Plaintiff also uses a heating pad "once or twice every two days."  (Tr. 57).  Plaintiff has hepatitis, so according to plaintiff, there are "a lot" of medications that he cannot take for his knee pain.  (Tr. 57-58).   When he takes painkillers, he becomes "irritable[ ]" and tired (Tr. 58), and his medications cause headaches, dizziness and upset stomach.  (Tr. 214).

Plaintiff does not have a driver's license and does not drive.  (Tr. 45, 207, 229, 234). He takes the bus to his doctors' appointments  (Tr. 53), and he regularly goes to physical therapy.  (Tr. 209).

B. PLAINTIFF'S WORK HISTORY & VOCATIONAL ANALYSIS

Plaintiff's work history includes work in the construction field and as a glazer at a glass company. (See Tr. 173-75, 199, 216, 239).  Previously, plaintiff underwent "some like lead abatement training . . . for glasswork[.]" (Tr. 46).  Plaintiff testified that he last worked in 2008, building and fabricating a storefront.  (Tr. 46; see Tr. 175, 216).  In this line of work, plaintiff would work ten hour days walking, standing, stooping, crouching, climbing,

4

crawling and reaching, and lifting two hundred to eight hundred pounds.  (Tr. 217-22).  Prior to that, plaintiff worked doing "glass and aluminum fabrication and installation." (Tr. 48). Plaintiff's records reveal that he did not work from 1995-97; he had a "knee injury" and was "living at home[,]" at that time.  (Tr. 48-49; <u>see</u> Tr. 173, 178).

C. MEDICAL RECORDS

Plaintiff's medical records begin with an admission to Yale New Haven Hospital from August 10 to August 13, 2010 for a lower gastrointestinal bleed secondary to colonic polyps. (Tr. 309-16).  Multiple polyps were removed during a colonoscopy on August 11. (Tr. 311; <u>see</u> Tr. 331-34).  On September 1, 2010, plaintiff underwent a follow-up colonoscopy, from which biopsies were taken.  (Tr. 302-03, 389-90; <u>see</u> Tr. 382-88, 391-94).[4]

Plaintiff was seen by Dr. Varun Kumar at Yale New Haven Hospital, Adult Primary Care Center ["Yale New Haven PCC"] on September 17, 2010 for "chronic right knee pain" and "new left knee pain with persistent left elbow pain." (Tr. 298-301).  Plaintiff was to be referred to a liver clinic for his hepatitis C.  (Tr. 298).  He reported that his knee pain increased with activity and he reported that due to a "recent GI bleed, NSAID's [were discontinued] and [T]ylenol does not work to alleviate the pain."  (Tr. 299).

On October 21, 2010, plaintiff was seen by Dr. Halima Amjad at Yale New Haven PCC. (Tr. 293-97).  Plaintiff reported knee pain from old football injuries; he was given Lidoderm patches. (Tr. 295).  Plaintiff reported that the pain is constant, and is "worse with movement/getting up as well as walking down steps."  (Tr. 294).  His pain is sharp and stabbing at times, and is "achy with radiation from buttocks to knees at other times."  (<u>Id.</u>). He was referred to a liver clinic given his history of hepatitis C.  (Tr. 293-94).  An ultrasound

---

[4]The polypectomy site biopsy revealed no significant abnormality.  (Tr. 253, 392, 394).

5

of the right upper quadrant of plaintiff's abdomen taken seven days later revealed a fatty infiltration of the liver.  (Tr. 254, 335).

Plaintiff was seen by Jessica Perez-Varga at Yale New Haven PCC on November 3, 2010 for an initial social work assessment.  (Tr. 289-91).  Plaintiff reported to Perez-Varga that while he had been drinking thirty beers a day, he stopped drinking in August 2010. (Tr. 289).   He was referred to the Behavioral Health Clinic for depression, although he did not report any symptoms of anxiety or depression; he reported "feeling stressed and sad from time to time, when thinking about his current situations."  (Tr. 290; see Tr. 292).  He also "complained a great deal of pain in his knees[.]" (Tr. 290).

Views of plaintiff's knees taken on November 30, 2010 revealed "degenerative changes in the medial and patellofemoral compartments" of plaintiff's left knee, "manifested by loss of articular cartilage and osteophytosis[,]" as well as "slight lateral tilt of the tibia[,]" and "small joint effusion." (Tr. 255, 336).  Plaintiff's right knee had "[s]crews in the proximal tibia and distal femur" indicative of "remote ACL reconstruction[,]" and "marked tricompartmental degenerative changes as noted by loss of articular cartilage and osteophytosis, most pronounced in the medial compartment." (Id.).

On December 1, 2010, plaintiff underwent another colonoscopy.  (Tr. 328-30; see Tr. 317-27, 338-44).  Two days later, plaintiff was seen by social worker Perez-Vega.  (Tr. 276). Plaintiff expressed concern over his lack of housing and he noted the pain in his knees.  (Id.). X-rays taken on December 5, 2010 of plaintiff's left ankle revealed a "sideplate with screw complex as well as two interfragmentary screws along the distal fibula[;]" "[t]he ankle mortise is grossly symmetric[;]" and "[t]here is a small bony fragment that is well corticated adjacent to the medial malleolus and likely represents old avulsion injury." (Tr. 255, 336,

360).

Plaintiff was seen by Dr. Pinar Oray-Schrom at Yale New Haven PCC on December 7, 2010 for multiple joint pain, and notably, for pain in his left ankle which he rated as a nine. (Tr. 272-75, 353-56, 457-61; see also Tr. 337, 357-59).   Plaintiff complained of constant bilateral knee pain as well as right shoulder pain and chronic decreased range of motion in the left lower arm.  (Tr. 273, 354, 458).  Upon examination, plaintiff had decreased extension in his right knee, his left ankle was swollen with a decreased range of motion due to pain, his right shoulder had normal range of motion but was tender to palpitation over the biceps tendon, and his lower left arm had decreased range of motion with external rotation of the lower arm.  (Tr. 273, 354-55, 458).[5]

On November 5 and December 2, 13 and 20, 2010, plaintiff was seen for physical therapy for his knees; he reported that the pain is the same and he is doing a home exercise program "without any problem[.]"  (Tr. 265-66, 269-71, 277-78, 281-86, 350-51; see Tr. 288).  Plaintiff had decreased range of motion, extremity weakness, and pain rated at a ten.  (Tr. 270, 285).  On November 5, plaintiff reported that his pain decreased when he is sitting or lying down.  (Tr. 282).  Plaintiff had positive left knee patellar tracking, tight hamstrings bilaterally, crepitus in his bilateral knees with flexion and extension, and audible crepitus in his left elbow with supination.  (Id.).

Plaintiff was seen by Dr. Oray-Schrom on January 19, 2011 for complaints of bilateral knee pain and left elbow pain that plaintiff rated a seven on a scale to ten.[6]  (Tr. 260-63,

---

[5]The record shows plaintiff missed several medical appointments, all but one with Perez-Vega.  (Tr. 267-69, 279-80).

[6]See Tr. 264 (January 5, 2011 follow up call; plaintiff "is in need of better pain medication").

7

453-56). Dr. Oray-Schrom referred plaintiff for x-rays, which were taken the same day. (Tr. 260; see Tr. 257-59). The x-rays of plaintiff's left shoulder revealed "[m]inor osteoarthritis . . . at the acromioclavicular joint." (Tr. 257-59). Views of plaintiff's elbow revealed osteoarthritic changes "throughout the elbow joint and bony remodeling of the radial head consistent with prior trauma[,]" and views of plaintiff's forearm revealed a "plate with associated screws . . . stabilizing a healed fracture through the proximal radial diaphysis." (Id.).

Plaintiff returned for physical therapy on February 3, 2011. (Tr. 363-69; see Tr. 370-71). In addition to his knee pain, plaintiff complained of pain in his left elbow, reduced flexion/extension and range of motion, weakness, and numbness and tingling. (Tr. 363). Upon examination, plaintiff had decreased left elbow "A-PRM (flexion worse than extension)[,]" and he complained of increased left elbow and shoulder pain and numbess in the left hand 4th and 5th digits, and decreased strength in left shoulder, elbow, forearm and grip. (Tr. 365-66). Plaintiff is "functionally limited in pain-free" activities of daily living. (Tr. 366). Plaintiff was seen again for physical therapy on February 14, and April 11, 2011. (Tr. 396, 403-04).

On February 4, 2011, plaintiff returned to Perez-Varga for a social work appointment. (Tr. 405). Plaintiff was seen on March 25, 2011, by Dr. Oray-Schrom for his bilateral knee pain. (Tr. 397-400, 449-52; see also Tr. 443-48). Dr. Oray-Schrom noted that plaintiff "[w]ould like to get [a] knee replacement," and would "try to find outside [an] orthopedist[ ]" who would take his insurance. (Tr. 398, 449). Plaintiff's pain was aching and throbbing, and he rated it as an eight. (Id.). He had decreased flexion in his right and his left knee; his left knee had negative anterior and posterior drawer, "normal lachman, stable to valg[u]s

8

and varrus stress joint."  (Tr. 400, 451).[7]  On December 30, 2011, plaintiff was seen for an urgent visit with Dr. Anna Evans for his low back pain and bilateral knee pain, which he described as a seven out of ten.  (Tr. 437-42).  Plaintiff was prescribed a cane.  (Tr. 439).

Plaintiff was seen by Dr. Oray-Schrom  on January 17, 2012 for his chronic knee pain. (Tr. 433-36; see Tr. 427-32).  In addition to his back pain, he had sharp pain from the gluteal area, shooting down his right leg, and he complained of left lower arm numbness.  (Tr. 433). He noted that he did not have insurance.  (Id.).

Plaintiff was seen by Dr. Sarah Malik, of the Yale School of Medicine, on March 20, 2012. (Tr. 422-26; see Tr. 419-21).  Plaintiff reported taking one Percocet in the morning while doing knee exercises and then three Ibuprofen tabs throughout the day, as well as using his Lidoderm patches.  (Tr. 422).   Due to his history of GI bleed, he was advised that he should not be taking Ibuprofen.  (Tr. 424).   Two days later, on March 22, 2012, plaintiff returned because he "[d]id not get pain relief and had side effects on [the] Fentanyl patch." (Tr. 412-16).   Plaintiff "would like to do PT if he has transportation[.]" (Tr. 412).   The Lidoderm patch was continued.  (Id.).  Plaintiff had numbness in his right lower arm from his elbow down.  (Tr. 413).   He had decreased flexion and extension in his left knee, and decreased anterior range of motion; his motor strength was 5/5 in the upper and lower extremities.  (Tr. 414).   He had decreased anterior range of motion and decreased lateral range of motion.  (Id.).

### D. MEDICAL OPINIONS

On December 7, 2010, Dr. Oray-Schrom completed a Residual Functional Capacity Assessment of plaintiff in which she noted plaintiff's diagnoses of arthralgias and hepatitis

---

[7]On April 3, 2012, plaintiff was seen for a headache.  (Tr. 418).

C, and she assessed plaintiff's prognosis as fair.  (Tr. 361-62).  According to the doctor, plaintiff's symptoms are "[o]ften" present, and plaintiff would need to recline during a typical eight-hour work day with lunch and two fifteen minute breaks.  (Id.). Plaintiff can sit for twenty minutes, and stand/walk for ten minutes at a time, and can sit for three hours and stand/walk for one hour in an eight hour work day.  (Id.). Plaintiff would need to take unscheduled breaks about three times a day for about fifteen minutes.  (Id.).  Plaintiff can frequently lift less than ten pounds, occasionally lift ten pounds, but never lift more than ten pounds.  (Tr. 362).  Plaintiff can reach for only thirty percent of the work day and can grasp and use fine finger manipulation for eighty percent of the work day.  (Id.).  He would be absent more than four times a month.  (Id.).

Dr. Oray-Schrom completed another form for SSA on behalf of plaintiff on February 8, 2011.  (Tr. 373-76).  She reported that she treats plaintiff on a monthly basis and has not seen any improvement.  (Tr. 373).  She noted that plaintiff exhibits dysthymia "due to pain and financial difficulties[,]" and appears to be in mild distress due to pain.  (Id.).  According to Dr. Oray-Schrom, plaintiff has a slightly decreased affect, and he has "[n]o [p]roblem" taking care of personal hygiene, using good judgment, and using appropriate coping skills.  (Tr. 374).  Additionally, he has a "[s]light [p]roblem" caring for his physical needs and handling frustration appropriately.  (Id.).  Plaintiff has "[n]o [p]roblem" interacting appropriately with others, asking questions or requesting assistance, respecting/responding appropriately to others, getting along with others, carrying out single or multi-step instructions, and focusing long enough to finish assigned simple activities.  (Tr. 375).  Additionally, plaintiff has a "[s]light [p]roblem" changing from one simple task to another, an "[o]bvious [p]roblem" performing basic work activities, and a "[s]erious [p]roblem"

performing work activity on a sustained basis.  (Id.).  The doctor noted that plaintiff has difficulties finding work due to his pain.  (Id.).

On February 1, 2011, Dr. Stephen F. Heller completed a Residual Functional Capacity Assessment of plaintiff in which he concluded that plaintiff can occasionally lift and carry up to twenty pounds; he can frequently lift and carry up to ten pounds; he can stand and/or walk up to four hours and sit about six hours in a work day; he is limited in his lower extremities with his ability to push and/or pull such that he can only occasionally push or pull with his right lower extremity; he can occasionally climb ramps and stairs, balance, kneel, crouch or crawl, but can never climb ladders, ropes or scaffolds.  (Tr. 77-78).  Upon Reconsideration on March 25, 2011, Dr. Virginia H. Rittner also concluded that plaintiff is not disabled.  (See Tr. 86-89).

Dr. Oray-Schrom completed a Residual Functional Capacity Questionnaire on behalf of plaintiff on January 13, 2012. (Tr. 409-10).  Her diagnoses included: osteoarthritis of both knees, back pain, history of elbow injury, history of GI bleed, and hepatitis C.  (Tr. 409).  Plaintiff suffers from elbow pain, knee pain and back pain.  (Id.).  Ibuprofen causes stomach upset and he has a history of dizziness from Tramadol and Oxycodone.  (Id.).  Plaintiff can walk about one-half a block before having to rest, and can sit for fifteen minutes, and can stand/walk for ten minutes at a time.  (Id.).  He cannot sit or stand for any number of hours during a work day, and he would need to take unscheduled breaks.  (Id.). Plaintiff can occasionally lift less than ten pounds but can never lift and carry more weight.  (Tr. 410).  He can grasp, perform fine manipulation and reach for seventy-five percent of the work day using his right arm, and for forty percent of the work day using his left arm.  (Id.).  He would be absent more than four times a month and he would be limited in his ability to work by his

11

back, shoulder, ankle and elbow pain.  (Id.).

### III.  STANDARD OF REVIEW

The scope of review of a Social Security disability determination involves two levels of inquiry.  First, the court must decide whether the Commissioner applied the correct legal principles in making the determination.   Second, the court must decide whether the determination is supported by substantial evidence.  See Balsamo v. Chater, 142 F.3d 75, 79 (2d Cir. 1998)(citation omitted). "A district court may set aside the Commissioner's determination that a claimant is not disabled only if the factual findings are not supported by 'substantial evidence' or if the decision is based on legal error." Burgess v. Astrue, 537 F.3d 117, 127 (2d Cir. 2008), quoting Shaw v. Chater, 221 F.3d 126, 131 (2d Cir. 2000); see also 42 U.S.C. § 405(g).  Substantial evidence is evidence that a reasonable mind would accept as adequate to support a conclusion; it is more than a "mere scintilla."  Richardson v. Perales, 402 U.S. 389, 401 (1971)(citation omitted); see Yancey v. Apfel, 145 F.3d 106, 111 (2d Cir. 1998)(citation omitted).  The substantial evidence rule also applies to inferences and conclusions that are drawn from findings of fact.  See Gonzalez v. Apfel, 23 F. Supp.2d 179, 189 (D. Conn. 1998)(citation omitted); Rodriguez v. Califano, 431 F. Supp. 421, 423 (S.D.N.Y. 1977)(citations omitted).  However, the court may not decide facts, reweigh evidence, or substitute its judgment for that of the Commissioner.  See Dotson v. Shalala, 1 F.3d 571, 577 (7th Cir. 1993)(citation omitted).  Instead, the court must scrutinize the entire record to determine the reasonableness of the ALJ's factual findings.  See id. Furthermore, the Commissioner's findings are conclusive if supported by substantial evidence and should be upheld even in those cases where the reviewing court might have found otherwise.  See 42 U.S.C. § 405(g); see also Beauvoir v. Charter, 104 F.3d 1432, 1433 (2d

Cir. 1997)(citation omitted).

Under the Social Security Act, every individual who is under a disability is entitled to disability insurance benefits.  <u>See</u>  42 U.S.C. § 423(a)(1).  "Disability" is defined as an "inability to engage in any substantial gainful activity by reason of a medically determinable physical or mental impairment which can be expected . . . to last for a continuous period of not less than 12 months."  42 U.S.C. § 423(d)(1).

Determining whether a claimant is disabled requires a five-step process.  <u>See</u> 20 C.F.R. § 404.1520.  First, the ALJ must determine whether the claimant is currently working. <u>See</u> 20 C.F.R. §§ 404.1520(a)(4)(i), 416.920(a)(4)(i).  If the claimant is not working, as a second step, the ALJ must make a finding as to the existence of a severe mental or physical impairment.  <u>See</u> 20 C.F.R. §§  404.1520(a)(4)(ii), 416.920(a)(4)(ii).  If the claimant is found to have a severe impairment, the third step is to compare the claimant's impairment with those in Appendix 1 of the Regulations [the "Listings"].  <u>See</u> 20 C.F.R. §§ 404.1520(a)(4)(iii), 416.920(a)(4)(iii); <u>Bowen v. Yuckert</u>, 482 U.S. 137, 141 (1987); <u>Balsamo</u>, 142 F.3d at 79-80. If the claimant's impairment meets or equals one of the impairments in the Listings, the claimant is automatically considered disabled.  <u>See</u> 20 C.F.R. §§  404.1520(a)(4)(iii), 416.920(a)(4)(iii); <u>see also Balsamo</u>, 142 F.3d at 80.  If the claimant's impairment does not meet or equal one of the listed impairments, as a fourth step, he will have to show that he cannot perform his former work.  <u>See</u> 20 C.F.R. §§  404.1520(a)(4)(iv), 416.920(a)(4)(iv). If the claimant shows that he cannot perform her former work, the burden shifts to the Commissioner to show that the claimant can perform other gainful work.  <u>See Balsamo</u>, 142 F.3d at 80 (citations omitted).  Accordingly, a claimant is entitled to receive disability benefits only if he shows that he cannot perform his former employment, and the Commissioner fails

13

to show that the claimant can perform alternate gainful employment.  See 20 C.F.R. §§ 404.1520(a)(4)(v), 416.920(a)(4)(v); see also Balsamo, 142 F.3d at 80 (citations omitted).

## IV.  DISCUSSION

Following the five step evaluation process, ALJ Thomas found that plaintiff has not engaged in substantial gainful activity since July 1, 2007, the alleged onset date of his disability.  (Tr. 25-26; see 20 C.F.R. §§ 404.1571 et seq., 416.971 et seq.).  ALJ Thomas then concluded that plaintiff has the following severe impairments: anthralgias, joint disease of the knees, and osteoarthritis (Tr. 26-28; see 20 C.F.R. §§ 404.1520(c), 416.920(c)), but his impairment or combination of impairments do not meet or equal an impairment listed in Appendix 1, Subpart P of 20 C.F.R. Part 404.  (Tr. 28-29; see 20 C.F.R. §§ 404.1520(d), 404.1525, 404.1526, 416.920(d), 416.925 and 416.926).  In addition, at step four, ALJ Thomas found that after consideration of the entire record, plaintiff has the RFC to perform sedentary work as defined in 20 C.F.R. 404.1567(a) and 20 C.F.R. 416.967(a), except that he can occasionally bend, stoop, twist, squat, kneel, crawl, climb and balance.  (Tr. 29-33).  Plaintiff is unable to perform his past relevant construction work (Tr. 33-34; 20 C.F.R. §§ 404.1565,  416.965), but the ALJ concluded there are jobs that exist in significant numbers in the national economy that plaintiff can perform. (Tr. 34; see 20 C.F.R. §§ 404.1569, 404.1569(a), 416.969, 416.969(a)).  Accordingly, the ALJ concluded that plaintiff has not been under a disability from July 1, 2007, through the date of his decision. (Tr. 34; 20 C.F.R. §§ 404.1520(g), 416.920(g)).

Plaintiff moves for an order reversing the decision of the Commissioner on grounds that the ALJ failed to apply the treating physician rule correctly (Dkt. #17, Brief at 19-28); the ALJ's findings with respect to plaintiff's credibility and claims of pain are fatally flawed

14

and unsupported (id. at 28-34); and the ALJ's evaluation of plaintiff's residual functional capacity is fatally flawed (id. at 35-36).

In response, defendant contends that the ALJ properly evaluated the medical opinions of record (Dkt. #22, Brief at 4-11); substantial evidence supports the ALJ's finding that plaintiff was not credible (id. at 11-14); and substantial evidence supports the ALJ's finding that there were jobs existing in substantial numbers in the national economy that plaintiff could perform.  (Id. at 14-15).

A. TREATING PHYSICIAN OPINIONS

"[T]he SSA recognizes a 'treating physician' rule of deference to the views of the physician who has engaged in the primary treatment of the claimant[.]"  Burgess, 537 F.3d at 128, quoting Green-Younger v. Barnhart, 335 F.3d 99, 106 (2d Cir. 2003)(internal quotations & alteration omitted).  Generally, "[t]he opinion of a treating physician on the nature or severity of a claimant's impairments is binding if it is supported by the medical evidence and not contradicted by substantial evidence in the record."  Selian v. Astrue, 708 F.3d 409, 418 (2d Cir. 2013), citing Burgess, 537 F.3d at 128 (opinion of treating physician as to the nature and severity of the impairment is given controlling weight so long as it is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in the record)(additional citations omitted); see also 20 C.F.R. § 404.1527(c)(2)(when the ALJ "find[s] that a treating source's opinion on the issue(s) of the nature and severity of [a claimant's] impairment(s) is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with other substantial evidence, . . . [the ALJ] will give it controlling weight.");  Rosa v. Callahan, 168 F.3d 72, 78-79 (2d Cir. 1999)(multiple citations omitted).   Under the

treating physician rule, an ALJ assigns weight to the a treating source's opinion after considering:

> (i) the frequency of the examination and the length, nature, and extent of the treatment relationship; (ii) the evidence in support of the opinion; (iii) the consistency of the opinion with the record as a whole; (iv) whether the opinion is from a specialist; and (v) other factors brought to the Social Security Administration's attention that tend to support or contradict the opinion.

Halloran v. Barnhart, 362 F.3d 28, 32 (2d Cir. 2004)(per curiam), citing 20 C.F.R. § 404.1527(d)(2), now § 404.1527(c)(2); see also Selian, 708 F.3d 418 ("In order to override the opinion of the treating physician, . . . the ALJ must explicitly consider" the foregoing factors).  "After considering the above factors, the ALJ must 'comprehensively set forth his reasons for the weight assigned to a treating physician's opinion.'" Burgess, 537 F.3d at 129, quoting Halloran , 362 F.3d at 33; see 20 C.F.R. § 404.1527(c)(2) (stating that the agency "will always give good reasons in our notice of determination or decision for the weight we give [the claimant's] treating source's opinion"(emphasis added)).  "[T]he ALJ cannot arbitrarily substitute his own judgment for competent medical opinion." Rosa, 168 F.3d at 79 (citation & internal quotations omitted).

In this case, Dr. Oray-Schrom, plaintiff's treating physician, completed no less than three medical assessments of plaintiff.  The first was completed in December 2010, at which time Dr. Oray-Schrom noted plaintiff's diagnoses of arthralgias and hepatitis C, assessed plaintiff's prognosis as fair, and noted that his symptoms are "[o]ften" present, and plaintiff would need to recline during a typical eight-hour work day with lunch and two fifteen minute breaks.  (Tr. 361-62). The doctor opined that plaintiff can sit for twenty minutes, and stand/walk for ten minutes at a time, and can sit for three hours and stand/walk for one hour in an eight hour work day, and he would need to take unscheduled breaks about three times

a day for about fifteen minutes.  (Id.).  Plaintiff can frequently lift less than ten pounds, occasionally lift ten pounds, but never lift more than ten pounds, and he can reach for only thirty percent of the work day and can grasp and use fine finger manipulation for eighty percent of the work day.  (Tr. 362).

Also as discussed above, Dr. Oray-Schrom completed another form for SSA on behalf of plaintiff in February 2011, in which she reported that she treats plaintiff on a monthly basis and has not seen any improvement.  (Tr. 373).  She noted that plaintiff exhibits dysthymia "due to pain and financial difficulties[,]" he appears to be in mild distress due to pain, he has a slightly decreased affect, and he has "[n]o [p]roblem" taking care of personal hygiene, using good judgment, and using appropriate coping skills.  (Tr. 373-74).  Additionally, Dr. Oray-Schrom opined that plaintiff has a "[s]light [p]roblem[,]" caring for his physical needs, handling frustration appropriately, and changing from one simple task to another; he has a "[s]erious [p]roblem" performing work activity on a sustained basis; he has an "[o]bvious [p]roblem" performing basic work activities; and he has "[n]o [p]roblem" interacting appropriately with others, asking questions or requesting assistance, respecting/responding appropriately to others, getting along with others, carrying out single or multi-step instructions, and focusing long enough to finish assigned simple activities.  (Tr. 374-75).  Additionally, the doctor noted that plaintiff has difficulties finding work due to his pain.  (Tr. 375).

Dr. Oray-Schrom also assessed plaintiff's RFC in January 2012. (Tr. 409-10).  Her diagnoses included: osteoarthritis of both knees, back pain, history of elbow injury, history of GI bleed, and hepatitis C (Tr. 409), and she noted that plaintiff suffers from elbow pain, knee pain and back pain.  (Id.).  Ibuprofen causes him stomach upset and he has a history

of dizziness from Tramadol and Oxycodone.  (Id.).  Plaintiff can walk about one-half a block before having to rest, and can sit for fifteen minutes, and can stand/walk for ten minutes at a time; he cannot sit or stand for any number of hours during a work day, and he would need to take unscheduled breaks; and, he can occasionally lift less than ten pounds but can never lift and carry more weight.  (Tr. 409-10).  He can grasp, perform fine manipulation and reach for seventy-five percent of the work day using his right arm, and for forty percent of the work day using his left arm.  (Tr. 410).  He would be absent more than four times a month and he would be limited in his ability to work by his back, shoulder, ankle and elbow pain.  (Id.).

        The ALJ assigned "partial weight" to Dr. Oray-Schrom's first opinion (Tr. 33), "little weight" to her January 2012 opinion  (id.), and "little weight" to her February 2011 mental impairments statement.  (Tr. 28).  In turn, the ALJ assigned "significant weight to the [non-examining] State agency's physical consultants' opinions[,]" who concluded that plaintiff can occasionally lift and carry up to twenty pounds; he can frequently lift and carry up to ten pounds; he can stand and/or walk up to four hours and sit about six hours in a work day; he is limited in his lower extremities with his ability to push and/or pull such that he can only occasionally push or pull with his right lower extremity; he can occasionally climb ramps and stairs, balance, kneel, crouch or crawl, but can never climb ladders, ropes or scaffolds.  (Tr. 33, 78).

### 1. DECEMBER 2010 AND JANUARY 2012 PHYSICAL RFC OPINION

        Plaintiff contends that the ALJ erred in suggesting that because Dr. Oray-Schrom is not an orthopedist, she is "somehow incapable of diagnosing and treating knee and back pain[.]" (Dkt. #17, Brief at 24).  Defendant responds that the "ALJ permissibly reduced the

weight given Dr. Oray-Schrom's opinion because she was not a specialist in the area on which she opined."  (Dkt. #22, Brief at 5, citing Selian, 708 F.3d at 418; 20 C.F.R. §§ 404.1527(c)(5), 416.927(c)(5)).  While defendant is correct that an ALJ must "explicitly consider, inter alia:" whether the treating physician is a specialist, this is one of several factors for the ALJ's consideration.  Selian, 709 F.3d 418.  In this case, Dr. Oray-Schrom continuously treated plaintiff from December 2010 through at least 2012.[8]  Beginning in December 2010, Dr. Oray-Schrom treated plaintiff for multiple joint pain, pain in his left ankle, constant bilateral knee pain, and right shoulder pain with chronic decreased range of motion in the left lower arm.   (Tr. 272-75, 353-56, 457-60; see also Tr. 337, 357-59).  Her opinion as to plaintiff's limitations at that time are not only supported by her own treatment records, but by September and October 2010 treatment records from other providers, and x-ray images taken in November 2010.

Specifically, Dr. Kumar, who saw plaintiff in September 2010, noted plaintiff's "chronic right knee pain" and "new left knee pain with persistent left elbow pain[,]" and noted that plaintiff's knee pain increased with activity. (Tr. 298-301).  A month later, Dr. Amjad noted plaintiff's knee pain from old football injuries;  plaintiff reported that the pain is constant, and is "worse with movement/getting up as well as walking down steps."  (Tr. 293-94).  Additionally, x-ray views of plaintiff's knees taken on November 30, 2010 revealed "degenerative changes in the medial and patellofemoral compartments" of plaintiff's left knee, "manifested by loss of articular cartilage and osteophytosis[,]" as well as "slight lateral tilt of the tibia[,]" and "small joint effusion."  (Tr. 255, 336).  Plaintiff's right knee had

---

[8]The ALJ, however, only had treatment records to March 2011; the Appeals Council had the subsequent treatment records. (See Tr. 31 (The ALJ noted that plaintiff's "treating physician expected his condition would continue to improve, but [plaintiff] discontinued his treatment and has not sought treatment since March, 2011.")).

"[s]crews in the proximal tibia and distal femur" indicative of "remote ACL reconstruction[,]" and "marked tricompartmental degenerative changes as noted by loss of articular cartilage and osteophytosis, most pronounced in the medial compartment." (Id.).  When he was seen by Dr. Oray-Schrom in December 2010, plaintiff was complaining of constant bilateral knee pain as well as right shoulder pain and chronic decreased range of motion in the left lower arm.  (Tr. 273, 353, 458).  Upon examination, plaintiff had decreased extension in his right knee, his left ankle was swollen with a decreased range of motion due to pain, his right shoulder had normal range of motion but was tender to palpitation over the biceps tendon, and his lower left arm had decreased range of motion with external rotation of the lower arm.  (Tr. 273, 354-55, 458).

In granting "partial weight" to the first opinion, the ALJ states that Dr. Oray-Schrom's "first opinion that the claimant was limited to sedentary work . . . was consistent with the medical evidence at that time," but that her second opinion was "unsupported by any medical evidence."  (Tr. 33).   As an initial matter, in her first opinion, Dr. Oray-Schrom did not conclude that plaintiff was limited to sedentary work.  Sedentary work is defined a work which involves "lifting no more than [ten] pounds at a time and occasionally lifting or carrying articles like docket files, ledgers, and small tools[,]" with a "certain amount of walking and standing[.]" 20 C.F.R. § 1567(a).  While the ALJ is correct that the doctor opined that plaintiff can frequently lift less than ten pounds and occasionally lift ten pounds (Tr. 362),  as stated repeatedly above, Dr. Oray-Schrom also opined that plaintiff would need to recline during a typical eight-hour work day with lunch and two fifteen minute breaks, as well as unscheduled breaks about three times a day, that plaintiff can sit for twenty minutes, and stand/walk for ten minutes at a time, and can sit for three hours and stand/walk for one hour

in an eight hour work day, he would be absent from work more than four times a month. (Tr. 361-62).

The ALJ asserts in his decision that as of March 2011, plaintiff's "condition was improving." (Tr. 33).  However, support for this statement is not found in the treatment records. To the contrary, at that time, Dr. Oray-Schrom discussed referring plaintiff to an orthopedist for knee replacement surgery as his condition was not improving.  (See Tr. 398). Plaintiff's pain was aching and throbbing, and he rated it as an eight.  (Tr. 398, 449).  He had decreased flexion in his right and his left knee; his left knee had negative anterior and posterior drawer, "normal lachman, stable to valgas and varrus stress joint." (Tr. 400, 451). On December 30, 2011, plaintiff was seen for an urgent visit with Dr. Anna Evans for his low back pain and bilateral knee pain; he was prescribed a cane.  (Tr. 437-42).  The treatment record notes that plaintiff's pain had been "worsening . . . over the past [six] months."  (Tr. 437).  On January 17, 2012,[9] two weeks after Dr. Oray-Schrom issued her January 3, 2012 physical RFC opinion, plaintiff returned to her for his chronic knee pain.  (Tr. 433-36; see Tr. 427-32).  In addition to his back pain, he had sharp pain from the gluteal area, shooting down his right leg, and he complained of left lower arm numbness.  (Tr. 433).  Notably, plaintiff reported that he did not have insurance at that time.  (Id.).[10]  Four months later, on

---

[9]See note 8 supra.

[10]The Court notes the fact that plaintiff did not have medical insurance.  Although he did not consider this point, the ALJ noted in his decision that "[although] his treating physician urged him to do so, [plaintiff] never sought treatment from an orthopedist." (Tr.  32; see also Tr. 33 ("Indeed, she repeatedly referred [plaintiff] to an orthopedist[.]")).  Pursuant to Social Security Ruling 96-7p:

> the adjudicator must not draw any inferences about an individual's symptoms and their functional effects from a failure to seek or pursue regular medical treatment without first considering any explanations that the individual may provide, or other information in the case record, . . . [including that] [t]he individual may be unable to afford treatment and may not have access to free or low-cost medical services.

May 22, 2012, plaintiff returned because he "[d]id not get pain relief and had side effects on [the] Fentanyl patch." (Tr. 412-16).  He had decreased flexion and extension in his left knee, and decreased anterior range of motion; his motor strength was 5/5 in the upper and lower extremities.  (Tr. 414).  He had decreased anterior range of motion and decreased lateral range of motion.  (Id.).

Rather than consider the foregoing records in full,[11] the ALJ did exactly what he has been warned against doing in the past: he "cherry-picked out of the record those aspects of the physicians' reports that favored his preferred conclusion and ignored all unfavorable aspects, without explaining his choices, let alone basing them on evidence in the record." Ardito v. Barnhart, 3:04 CV 1633(MRK), 2006 WL 1662890, at *5 (D. Conn. May 25, 2006); see also Puzycki v. Astrue, 3:09 CV 1894(PCD), at 50 (D. Conn. Nov. 23, 2011), quoting Ardito.  The ALJ then assigned "significant weight" to opinions of the nonexamining state agency document reviewers, who, like Dr. Oray-Schrom, are not orthopedic specialists, and unlike Dr. Oray-Schrom, neither examined plaintiff, let alone had a treatment history with plaintiff, nor reached conclusions supported by the medical record.  (Tr. 33); see Schisler v. Sullivan, 3 F.3d 563, 568 (2d Cir. 1993)(The regulations "permit the opinions of non-examining sources to override a treating source's opinions, provided they are supported by evidence in the record.")(citations omitted).  The ALJ ignored the guiding premise that "[t]he opinion of a treating physician on the nature or severity of a claimant's impairments is binding if it is supported by the medical evidence and not contradicted by substantial

---

1996 WL 374186, at *8 (S.S.A. July 2, 1996).  Additionally, in January 2011, when plaintiff was first referred to the orthopedist, the orthopedist declined the appointment, which Dr. Oray-Schrom noted, "must [have] be[en] a misunderstanding."  (Tr. 260).  Thus, contrary to the ALJ's conclusion, plaintiff did try to see the orthopedist when he was first referred.

[11]But see note 8 supra.

evidence in the record."  <u>Selian</u>, 708 F.3d at 418 (citations omitted).

<u>2. JANUARY 2011 MENTAL LIMITATION OPINION</u>

In his decision, the ALJ explained that the reason he assigned "little weight" Dr. Oray-Schrom's mental impairments statement is that the doctor "is not a specialist[,]" "she has not referred [plaintiff] to a specialist or prescribed any medications[,]" and "her opinion is not consistent with . . . [plaintiff's] own statements, as he specifically reported that his symptoms of depression are sporadic and do not preclude him from working." (Tr. 28).

There are several references to mental health referrals in the record, all of which are excluded by the ALJ in reaching the foregoing broad conclusion.  On October 21, 2010, Dr. Amjad noted: "Will refer to psych for counseling re: depression." (Tr. 293).  The next day, Deborah Weinstein, LCSW noted that "[r]egarding the referral of [plaintiff] to Behavioral Medicine Clinic: . . . Social work and recommendations were made for out patient treatment and information was given to him.  Researching what the recommendations were . . . so that they can be followed up by [plaintiff.]" (Tr. 292).  On November 3, 2010, plaintiff was seen by Perez-Varga at Yale New Haven PCC for an initial social work assessment, and he was referred to the Behavioral Health Clinic for depression.  (Tr. 289-91).  Furthermore, on March 25, 2011, Dr. Oray-Schrom referred plaintiff to "Social Work-Yale[,]" (Tr. 446-47), and on May 22, 2012, Dr. Oray-Schrom prescribed Cymbalta and noted that she "[w]ill refer to behavioral health for counseling as well." (Tr. 412).   Thus, while the ALJ is correct that Dr. Oray-Schrom is not a mental health specialist, he errs in discounting Dr. Oray-Schrom's opinion on the basis of a lack of referrals for mental health treatment and a lack of prescribed treatment, as the record contains several entries to the contrary.  The ALJ also concludes "Dr. Oray-Schrom offered to refer [plaintiff] to a social worker to help him with his

homelessness, but [plaintiff] refused and stated he had enough help, which indicates his living situation was less desperate than he alleged." (Tr. 32). The ALJ's reference to Dr. Oray-Schrom's entry is at the exclusion of the earlier portion of the entry in the record that explains that plaintiff was offered the social work referral because he was homeless at that time (Tr. 398), and despite the ALJ's decision that plaintiff's "living situation was less desperate than he alleged[,]" (Tr. 32), the record is full of references to plaintiff's homelessness and the desperation of the situation. (See, e.g., Tr. 398, 412, 437, 447, 450). Unfortunately, once again the ALJ's conclusions are not supported by the underlying medical record, and the ALJ's treatment of the treating physician's opinion is affected by his selective version of the record. Accordingly, this matter must be remanded for proper consideration of the treating physician opinions.

### B. OTHER ARGUMENTS

Plaintiff also contends that the ALJ erred in his credibility determination and in his evaluation of plaintiff's residual functional capacity assessment. (Dkt. #17, Brief at 28-37). In light of the conclusion reached in Section IV.A. supra, the ALJ's residual functional capacity assessment must be reassessed after proper consideration of the treating physician opinions in accord with this Recommended Ruling. Additionally, as referenced above,[12] when assessing plaintiff's credibility, an ALJ is required to consider (1) medical signs and laboratory findings; (2) the diagnoses, prognoses, and medical opinions provided by the medical sources; and (3) statements and reports from the individual and from treating or examining physicians and psychologists and others about the claimant's medical history, treatment and response, prior work record, efforts to work, daily activities, and other information

---

[12]See note 10 supra.

concerning the claimant's symptoms and how they affect the claimant's ability to work.  SSR 96-7p, 1996 WL 374186, at *5.  In this case, as discussed above, and herein, the ALJ "cherry-picked" portions of the record to support his ultimate conclusion, and in some instances, referred to evidence not in the record.  Defendant acknowledges there is no evidence to support the ALJ's citation of plaintiff's lack of regular attendance at physical therapy sessions, and defendant also acknowledges that contrary to the ALJ's broad statement about plaintiff never followed his treating physician's advice to see an orthopedist, plaintiff did follow up on the referral in January 2011 but through no fault of his own, was unable to get an orthopedic appointment.  (Dkt. #22, Brief at 13).  The ALJ did not properly assess plaintiff's credibility in accord with SSR 96-7p; upon remand the ALJ shall make a credibility assessment, and if he discredits plaintiff, he must do so with "sufficient specificity[.]" Romano v. Apfel, No. 99 CIV. 2689 LMM, 2001 WL 199412, at *6 (S.D.N.Y. Feb. 28, 2001)(citation omitted).

V. CONCLUSION

Accordingly, for the reasons stated above, plaintiff's Motion to Reverse (Dkt. #17) is granted such that this matter is remanded for consideration of the treating physician's opinions consistent with this Recommended Ruling, and in turn, for further consideration of plaintiff's credibility and residual functional capacity in light of the medical evidence of record; defendant's Motion to Affirm (Dkt. #22) is denied.

The parties are free to seek a district judge's review of this recommended ruling.  See 28 U.S.C. § 636(b)**(written objection to ruling must be filed within fourteen calendar days after service of same)**; FED. R. CIV. P. 6(a) & 72; Rule 72.2 of the Local Rule for United States Magistrate Judges, United States District Court for the District of

Connecticut; Small v. Secretary of HHS, 892 F.2d 15, 16 (2d Cir. 1989)**(failure to file timely objection to Magistrate Judge's recommended ruling may preclude further appeal to Second Circuit)**.

Dated at New Haven, Connecticut, this 5th day of March, 2014.


 /s/ Joan G. Margolis USMJ
Joan Glazer Margolis
United States Magistrate Judge

26